**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>           Plaintiff,<br><br>    v.<br><br>LIBERTY LATIN AMERICA LTD.,<br><br>LIBERTY COMMUNICATIONS OF<br>PUERTO RICO LLC,<br><br>and<br><br>AT&T INC.<br><br>           Defendants. | Case No. 1:20-cv-03064 (TNM) |

**FINAL JUDGMENT**

WHEREAS, Plaintiff, United States of America, filed its Complaint on October 23, 2020;

AND WHEREAS, the United States and Defendants, Liberty Latin America Ltd.

("LLA"), Liberty Communications of Puerto Rico LLC ("LCPR"), and AT&T Inc. ("AT&T"),

have consented to entry of this Final Judgment without the taking of testimony, without trial or

adjudication of any issue of fact or law, and without this Final Judgment constituting any

evidence against or admission by any party regarding any issue of fact or law;

AND WHEREAS, Defendants agree to make a divestiture to remedy the loss of

competition alleged in the Complaint;

AND WHEREAS, Defendants represent that the divestiture and other relief required by

this Final Judgment can and will be made and that Defendants will not later raise a claim of

hardship or difficulty as grounds for asking the Court to modify any provision of this Final Judgment;

NOW THEREFORE, it is ORDERED, ADJUDGED, AND DECREED:

## I.    JURISDICTION

The Court has jurisdiction over the subject matter of and each of the parties to this action. The Complaint states a claim upon which relief may be granted against Defendants under Section 7 of the Clayton Act, as amended (15 U.S.C. § 18).

## II.    DEFINITIONS

As used in this Final Judgment:

A.    "AT&T" means Defendant AT&T Inc., a Delaware corporation with its headquarters in Dallas, Texas, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures, and their directors, officers, managers, agents, and employees.

B.    "LCPR" means Defendant Liberty Communications of Puerto Rico LLC, a Puerto Rico limited liability company with its headquarters in San Juan, Puerto Rico, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures, and their directors, officers, managers, agents, and employees.

C.    "LLA" means Defendant Liberty Latin America Ltd., a Bermuda corporation with its headquarters in Hamilton, Bermuda, and executive offices in Denver, Colorado, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures, and their directors, officers, managers, agents, and employees.

D.    "WorldNet" means WorldNet Telecommunications Inc., a Puerto Rico corporation with its headquarters in Guaynabo, Puerto Rico, its successors and assigns, and its

2

subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures, and their directors, officers, managers, agents, and employees.

    E.      "Acquirer" means WorldNet or another entity to which Defendants divest the Divestiture Assets.

    F.      "AT&T Aerial Fiber Core Segments" means the aerial fiber core network segments that connect AT&T's communications hubs to each other across Puerto Rico (excluding (1) the segment between Arecibo and Ponce and (2) the segments between or among Guaynabo, AT&T Plaza, Hato Rey, and Carolina).

    G.      "AT&T Customers" means enterprise and wholesale customers in Puerto Rico (excluding AT&T Global Services customers) that purchased services from AT&T immediately prior to the Transaction, all of which are being transferred to LLA upon closing of the Transaction.

    H.      "Columbus Customers" means LLA customers with one or more service locations on the Columbus Network but does not include (1) AT&T Customers or (2) LLA customers who purchase video, hybrid fiber-coaxial, wholesale, or residential services.

    I.      "Columbus Divestiture Assets" means all of LLA's rights, titles, and interests in, to, or under:

        1.   the Columbus Network; and

        2.   all LLA assets related to or used in connection with the provision of fiber-based connectivity and/or telecommunications services to locations on the Columbus Network or related to or used in connection with Columbus Customers, including:

3

a.  all active or pending licenses, permits, certifications, approvals, consents, registrations, and waivers issued by any governmental organization;

b.  all rights of way, easements, and access agreements;

c.  all contracts, contractual rights, agreements, leases, commitments, certifications, and understandings;

d.  all Columbus Customer lists, contracts, accounts, relationships, and credit records;

e.  all intellectual property associated with the Columbus brand, including copyrights, trademarks, trade names, service marks, and service names; and

f.  all records and data, including all repair, maintenance, and performance records.

*Provided, however,* that the Columbus Divestiture Assets do not include (1) any subsea cable or any connection rights to subsea cable; (2) customer contracts for customers to whom LLA provides video, hybrid fiber-coaxial, wholesale, or residential services; (3) the LCPR Network; (4) the IRU between LCPR and Cable & Wireless Puerto Rico Inc. effective as of April 1, 2019; or (5) the IRU between Columbus Networks of Puerto Rico LLC and Liberty Communications of Puerto Rico LLC effective as of October 1, 2020.

J.    "Columbus Network" means the fiber-based communication system in the San Juan Metro Area that LLA acquired as part of its May 17, 2016, acquisition of Cable & Wireless Communications, including colocation rights or a leasehold at the communications hubs located at Ana G. Méndez, Bayamón Corujo, Double Tree, MCS, and Metro Office Park; the equipment

in those hubs; the facilities connecting the hubs to each other and to Columbus Customer locations; and any customer premises equipment at Columbus Customer locations.

K.    "Construction Contractors" means individuals or companies hired by Defendants to conduct construction activities, which include contacting customers to request permission to conduct site surveys and obtain building access for construction activities.

L.    "Divestiture Assets" means the Columbus Divestiture Assets, the LCPR Divestiture Assets, and the LCPR IRU.

M.    "Divestiture Date" means the date on which LLA and the Acquirer close on a transaction effecting the required divestiture.

N.    "IRU" means one or more grants of an indefeasible right of use, a long-term interest that gives the holder of such interest the right for either (1) the exclusive use of specific fiber strands or other communications facilities or (2) the exclusive use of a specified amount of capacity in a fiber-based cable or other communications facility.

O.    "LCPR Customers" means LLA customers with one or more service locations on the LCPR Network but does not include (1) AT&T Customers; (2) LLA customers who purchase video, hybrid fiber-coaxial, wholesale, or residential services; or (3) customers solely receiving service for dedicated subsea capacity.

P.    "LCPR Network" means the fiber-based communication system owned by LCPR in Puerto Rico as of the date immediately preceding the closing of the Transaction, including all LCPR hubs in Puerto Rico (other than Columbus Network hubs), the equipment in those hubs, and the facilities connecting the hubs to each other and to LCPR Customer locations, and any customer premises equipment at LCPR Customer locations.

Q.  "LCPR Divestiture Assets" means all of LLA's rights, titles, and interests in, to, or under:

1.  all facilities owned by LCPR that are used to serve LCPR Customers exclusively; and

2.  all other LLA assets related to or used in connection with the provision of fiber-based connectivity and/or telecommunications services to LCPR Customers or with facilities that are used to serve LCPR Customers exclusively, including:

    a.  all licenses, permits, certifications, approvals, consents, registrations, and waivers issued by any governmental organization;

    b.  all rights of way, easements, and access agreements;

    c.  all contracts, contractual rights, agreements, leases, commitments, certifications, and understandings;

    d.  all LCPR Customer lists, contracts, accounts, relationships, and credit records; and

    e.  all records and data, including all repair, maintenance, and performance records.

*Provided, however,* that the LCPR Divestiture Assets do not include (1) assets used in the provision of video, hybrid fiber-coaxial, wholesale, or residential data services; (2) customer contracts for customers to whom LCPR provides video, hybrid fiber-coaxial, wholesale, or residential data services; (3) customer premises equipment for such customers or fiber drops to such customer locations; (4) any subsea cable or any connection rights to subsea cable; or (5) any

assets that are required for the operation of the LCPR Network but are not required for the provision of fiber-based connectivity and/or telecommunications services to LCPR Customers.

R.      "LCPR IRU" means an exclusive IRU to provide fiber-based connectivity and telecommunications services over all portions of the LCPR Network that were used as of October 15, 2020 to serve LCPR Customers but are not included in the LCPR Divestiture Assets, the term of which is (1) at least five years for fiber routes to LCPR Customer locations within one mile of the Columbus Network; and (2) at least 15 years for all other fiber routes with one five-year extension at the option of the Acquirer.

S.      "Regulatory Approvals" means (1) any approvals or clearances from the Federal Communications Commission, from any agency of Puerto Rico or its subdivisions, or under antitrust or competition laws that are required for the Transaction to proceed; and (2) any approvals or clearances pursuant to filings with CFIUS or under antitrust, competition, or other U.S. or international laws that are required for Acquirer's acquisition of the Divestiture Assets to proceed.

T.      "Relevant Personnel" means all full-time, part-time, or contract employees of LCPR, wherever located, who spent all, or a majority, of their time in the operation of the Divestiture Assets at any time between January 1, 2019, and October 15, 2020, including sales, marketing, and sales support personnel, as well as network and operations personnel, including customer care, service installation technicians, service repair technicians, engineering, and outside plant personnel.

U.      "San Juan Metro Area" means the municipalities of San Juan, Bayamón, Guaynabo, Carolina, Trujillo Alto, Cataño, Toa Baja, and Toa Alta.

V.     "Transferred Customers" means the Columbus Customers and the LCPR Customers.

W.     "Transaction" means the proposed acquisition of AT&T's wireline and wireless assets in Puerto Rico and the U.S. Virgin Islands by LLA.

### III.    APPLICABILITY

A.     This Final Judgment applies to LLA, LCPR, and AT&T, as defined above, and all other persons in active concert or participation with any Defendant who receive actual notice of this Final Judgment.

B.     If, prior to complying with Sections IV and V of this Final Judgment, LLA sells or otherwise disposes of all or substantially all of its assets or of business units that include the Divestiture Assets, AT&T Aerial Fiber Core Segments, or poles or conduit subject to the Acquirer options provided for in Paragraphs IV.J – IV.M, LLA must require any purchaser to be bound by the provisions of this Final Judgment that apply to the assets to be sold. LLA need not obtain such an agreement from Acquirer.

### IV.    DIVESTITURE

A.     LLA is ordered and directed, within 30 calendar days after the Court's entry of the Asset Preservation Stipulation and Order in this matter, to divest the Divestiture Assets in a manner consistent with this Final Judgment to an Acquirer acceptable to the United States, in its sole discretion. The United States, in its sole discretion, may agree to one or more extensions of this time period not to exceed 60 calendar days in total and will notify the Court of any extensions.

B.     If Acquirer or LLA has initiated contact with any governmental entity to seek any Regulatory Approval within five calendar days after the United States provides written notice

8

pursuant to Paragraph VI.C. that it does not object to the proposed Acquirer, the time period provided in Paragraph IV.A. will be extended until 15 calendar days after that Regulatory Approval is received, except that the extension allowed for securing Regulatory Approvals may be no longer than 90 calendar days past the time period provided in Paragraph IV.A., unless the United States, in its sole discretion, consents to an additional extension.

        C.      LLA must use its best efforts to divest the Divestiture Assets as expeditiously as possible, and Defendants may not take any action to impede the permitting, operation, or divestiture of the Divestiture Assets.

        D.      Unless the United States otherwise consents in writing, the divestiture pursuant to this Final Judgment must include the entire Divestiture Assets and must be accomplished in such a way as to satisfy the United States, in its sole discretion, that the Divestiture Assets can and will be used by Acquirer as part of a viable, ongoing business of providing fiber-based connectivity and telecommunications services to enterprise customers in Puerto Rico and that the divestiture to Acquirer will remedy the competitive harm alleged in the Complaint.

        E.      LLA must provide Acquirer with an LCPR IRU to provide fiber-based connectivity and telecommunications services over specific fiber strands in the LCPR Network that are dedicated to Acquirer's use. For (a) individual distribution fiber routes in the San Juan Metro Area where LLA's existing usage of the fiber exceeded industry best practices as of October 15, 2020, and (b) routes on LCPR's fiber core network, the LCPR IRU may provide Acquirer with the right to use a fixed amount of capacity rather than dedicated fiber strands. This fixed amount of capacity must be equal to the amount of capacity on the route that was used by LLA to serve LCPR Customers as of October 15, 2020, plus a commercially reasonable amount

of additional capacity to allow Acquirer to provide additional services to both LCPR Customers and other customers in the future.

1.  The LCPR IRU must include all rights and interests necessary to enable the LCPR IRU to be used by Acquirer to provide fiber-based connectivity and telecommunications services, including the right for Acquirer to splice into the IRU fiber at existing splice points or at new splice points requested by Acquirer, *provided, however*, that the LCPR IRU need not permit the Acquirer to splice at new splice points that would jeopardize the integrity of the LCPR Network.

2.  The LCPR IRU must provide Acquirer with repair, maintenance, and installation capabilities of the same quality and speed that LCPR utilizes for its own network.

3.  The LCPR IRU must not require Acquirer to pay a monthly or other recurring fee to preserve or make use of its rights but may contain other commercially reasonable and customary terms, including terms for payment to the grantor for ancillary services, such as non-recurring costs or repair fees.

4.  The LCPR IRU must include an option, exercisable at the option of the Acquirer on commercially reasonable terms, for Acquirer to purchase the right to use the IRU to provide residential service.

5.  Within 30 calendar days after the Court's entry of the Asset Preservation Stipulation and Order in this matter, LLA must identify to Acquirer and the United States each of the fiber routes to LCPR Customer locations within one mile of the Columbus Network.

F.      The divestiture must be made to an Acquirer that, in the United States' sole judgment, has the intent and capability (including the necessary managerial, operational, technical, and financial capability) to compete effectively in the provision of fiber-based connectivity and telecommunications services to enterprise customers in Puerto Rico.

G.      The divestiture must be accomplished so as to satisfy the United States, in its sole discretion, that none of the terms of any agreement between Acquirer and LLA gives LLA the ability unreasonably to raise Acquirer's costs, to lower Acquirer's efficiency, or otherwise to interfere in the ability of Acquirer to compete effectively.

H.      In the event LLA is attempting to divest the Divestiture Assets to an Acquirer other than WorldNet, LLA promptly must make known, by usual and customary means, the availability of the Divestiture Assets. LLA must inform any person making an inquiry regarding a possible purchase of the Divestiture Assets that the Divestiture Assets are being divested in accordance with this Final Judgment and must provide that person with a copy of this Final Judgment. LLA must offer to furnish to all prospective Acquirers, subject to customary confidentiality assurances, all information and documents relating to the Divestiture Assets that are customarily provided in a due-diligence process; *provided, however,* that LLA need not provide information or documents subject to the attorney-client privilege or work-product doctrine. LLA must make all information and documents available to the United States at the same time that the information and documents are made available to any other person.

I.      LLA must provide prospective Acquirers with (1) access to make inspections of the Divestiture Assets; (2) access to all environmental, zoning, and other permitting documents and information; and (3) access to all financial, operational, or other documents and information

11

customarily provided as part of a due diligence process. LLA also must disclose all encumbrances on any part of the Divestiture Assets, including on intangible property.

J.      At the option of Acquirer, within three years after the Divestiture Date, LLA must sell to Acquirer, on a segment-by-segment basis, and on commercially reasonable terms to be approved by the United States in its sole discretion, each of the AT&T Aerial Fiber Core Segments. The United States, in its sole discretion, may consent to one or more extensions of this time period not to exceed one year.

1.  Within 30 calendar days after the Court's entry of the Asset Preservation Stipulation and Order in this matter, LLA must identify and describe with specificity each of the AT&T Aerial Fiber Core Segments to Acquirer and the United States.

2.  If LLA serves customer locations that cannot be migrated off a segment acquired pursuant to this Paragraph IV.J., LLA may negotiate terms with Acquirer pursuant to which LLA may retain an IRU necessary to serve such customer locations.

K.      From the Divestiture Date until the date on which LLA completes its obligation under Paragraph IV.J, LLA must maintain the AT&T Aerial Fiber Core Segments in the ordinary course of business and consistent with past practices as ongoing, economically viable, competitive assets and must take all other actions necessary to preserve and maintain the full economic viability, marketability, and competitiveness of the AT&T Aerial Fiber Core Segments, including:

1.  LLA must maintain all licenses, permits, approvals, authorizations, and certifications related to or necessary for the operation of the AT&T Aerial

Fiber Core Segments and must maintain the AT&T Aerial Fiber Core Segments in compliance with all regulatory obligations and requirements;

2. LLA must ensure that the AT&T Aerial Fiber Core Segments are fully maintained in operable condition, including by maintaining and adhering to normal repair and maintenance schedules for the AT&T Aerial Fiber Core Segments.

3. Except as approved by the United States in accordance with the terms of the proposed Final Judgment, LLA may not sell, lease, assign, transfer, pledge, or encumber, any AT&T Aerial Fiber Core Segment(s) prior to completing its obligation under Paragraph IV.J.

4. LLA may decommission AT&T Aerial Core Fiber Segment(s), so long as it provides at least 60 days' advance written notice to Acquirer before doing so. If Acquirer does not exercise its option to purchase the identified segment(s) within 60 days after such notice is given, LLA may proceed with decommissioning.

L.   At the option of Acquirer, at any time during the term of this Final Judgment, LLA must grant to Acquirer, on commercially reasonable terms comparable to those found in LLA's other pole attachment agreements and to be approved by the United States in its sole discretion, the right to attach fiber to LLA-owned poles located on the island of Puerto Rico where space on such poles is available. LLA is not required to reserve space on poles for Acquirer or to obtain regulatory approvals for Acquirer to install pole attachments.

M.   At the option of Acquirer, at any time within three years of the Divestiture Date, LLA must sell to Acquirer, on commercially reasonable terms to be approved by the United

States in its sole discretion, up to one inch in diameter of space, and the right to install fiber

cables in such space, in any underground conduit in Puerto Rico that (1) was owned by LLA or

AT&T as of October 15, 2020, and (2) contains at least two inches in diameter of unused space

(measured as the sum of all unused space, including space spread across multiple innerducts,

within the conduit) as of the date of Acquirer's request.

1. Within 30 calendar days after the Court's entry of the Asset Preservation

   Stipulation and Order in this matter, LLA must identify to Acquirer and the

   United States all underground conduit routes in Puerto Rico that (1) were

   owned by LLA or AT&T as of October 15, 2020, and (2) contained at least

   two inches in diameter of unused space (measured as the sum of all unused

   space, including space spread across multiple innerducts, within the conduit)

   as of October 15, 2020.

2. Prior to deploying new facilities in any conduit route identified pursuant to

   Paragraph IV.M.1 during the three-year period specified above or during any

   extension under Paragraph IV.M.3 below, LLA must provide at least 60 days'

   advance written notice to Acquirer if such deployment would result in less

   than two inches in diameter of unused space (measured as the sum of all

   unused space, including space spread across multiple innerducts, within the

   conduit) remaining in the conduit. If Acquirer does not exercise its option to

   acquire that conduit space within 60 days after such notice is given, then LLA

   may proceed with the deployment.

3. If the United States consents to an extension or extensions of the period

   specified in Paragraph IV.J of this Final Judgment, the period within which

Acquirer must exercise its option to acquire conduit space will be extended by the same amount of time.

4. Nothing in this Paragraph IV.M requires LLA to bear the expense of Acquirer's installation of fiber in LLA conduit or to obtain permits, authorizations, or regulatory approvals for such installation.

N.   LLA must cooperate with and assist Acquirer to identify and hire all Relevant Personnel.

1. Within 10 business days following the filing of the Complaint in this matter, LLA must identify all Relevant Personnel to Acquirer and the United States, including by providing organization charts covering all Relevant Personnel.

2. Within 10 business days following receipt of a request by Acquirer, the United States, or the monitoring trustee, LLA must provide to Acquirer, the United States, and the monitoring trustee the following additional information related to Relevant Personnel: name; job title; current salary and benefits including most recent bonus paid, aggregate annual compensation, current target or guaranteed bonus, if any, any retention agreement or incentives, and any other payments due to or promises made to the employee; descriptions of reporting relationships, past experience, responsibilities, and training and educational histories; lists of all certifications; and all job performance evaluations. If LLA is barred by any applicable law from providing any of this information, LLA must provide, within 10 business days following receipt of the request, the requested information to the full extent permitted by law and

also must provide a written explanation of LLA's inability to provide the remaining information.

3.  At the request of Acquirer, LLA must promptly make Relevant Personnel available for private interviews with Acquirer during normal business hours at a mutually agreeable location.

4.  Defendants must not interfere with any effort by Acquirer to employ any Relevant Personnel. Interference includes, but is not limited to, offering to increase the compensation or improve the benefits of Relevant Personnel unless: (a) the offer is part of a company-wide increase in compensation or improvement in benefits that was announced prior to October 9, 2019; or (b) the offer is approved by the United States, in its sole discretion. Defendants' obligations under this Paragraph IV.N.4 will expire six months after the Divestiture Date.

5.  For Relevant Personnel who elect employment with Acquirer within six months of the Divestiture Date, LLA must waive all non-compete and non-disclosure agreements, vest all unvested pension and other equity rights, provide any pay pro-rata, provide all other compensation and benefits that those Relevant Personnel have fully or partially accrued, and provide all benefits that those Relevant Personnel otherwise would have been provided had the Relevant Personnel continued employment with LLA, including any retention bonuses or payments. LLA may maintain reasonable restrictions on disclosure by Relevant Personnel of LLA's proprietary non-public

information that is unrelated to the Divestiture Assets and not otherwise required to be disclosed by this Final Judgment.

6. For a period of one year from the Divestiture Date, Defendants may not solicit to rehire Relevant Personnel who were hired by Acquirer within six months of the Divestiture Date unless (a) an individual is terminated or laid off by Acquirer or (b) Acquirer agrees in writing that Defendants may solicit to rehire that individual. Nothing in this Paragraph IV.N.6 prohibits Defendants from advertising employment openings using general solicitations or advertisements and rehiring Relevant Personnel who apply for an employment opening through a general solicitation or advertisement.

O.     LLA must warrant to Acquirer that (1) the Divestiture Assets will be operational and without material defect on the date of their transfer to the Acquirer; (2) there are no material defects in the environmental, zoning, or other permits pertaining to the operation of the Divestiture Assets; and (3) LLA has disclosed all encumbrances on any part of the Divestiture Assets, including on intangible property. Following the sale of the Divestiture Assets, LLA must not undertake, directly or indirectly, challenges to the environmental, zoning, or other permits pertaining to the operation of the Divestiture Assets.

P.     LLA must assign, subcontract, or otherwise transfer all contracts, agreements, and customer relationships (or portions of such contracts, agreements, and customer relationships) included in the Divestiture Assets, including all supply and sales contracts, to Acquirer; *provided, however,* that for any contract or agreement that requires the consent of another party to assign, subcontract, or otherwise transfer, LLA must use best efforts to accomplish the

assignment, subcontracting, or transfer. LLA must not interfere with any negotiations between Acquirer and a contracting party.

Q.      LLA must make best efforts to assist Acquirer to obtain all necessary licenses, registrations, and permits to operate the Divestiture Assets. Until Acquirer obtains the necessary licenses, registrations, and permits, LLA must provide Acquirer with the benefit of LLA's licenses, registrations, and permits to the full extent permissible by law.

R.      At the option of Acquirer, and subject to approval by the United States, in its sole discretion, on or before the Divestiture Date, LLA must enter into a contract to provide transition services for back office, billing, provisioning, human resources, accounting, employee health and safety, and information technologies services and support for a period of up to 18 months on terms and conditions reasonably related to market conditions for the provision of transition services. The United States, in its sole discretion, may approve one or more extensions of any contract for transition services, for a total of up to an additional 6 months. If Acquirer seeks an extension of the term of any transition services contract, LLA must notify the United States in writing at least three months prior to the date the contract for transition services expires. Acquirer may terminate a transition services contract without cost or penalty at any time upon commercially reasonable notice.

S.      For a period of one year following the Divestiture Date, LLA must not initiate customer-specific communications to solicit any Transferred Customer; *provided, however,* that: (1) LLA may respond to inquiries initiated by Transferred Customers and enter into negotiations at the request of such customers (including responding to requests for quotation or proposal) to supply any business, whether or not such business was included in the Divestiture Assets; and (2) LLA must maintain a log of telephonic, electronic, in-person, and other communications that

constitute inquiries or requests from Transferred Customers within the meaning of this Paragraph

IV.S and make it available to the United States for inspection upon request. For so long as this

prohibition is in effect, LLA must ensure that its Construction Contractors, in performing work

on behalf of LLA, do not initiate communications with any Transferred Customer unless (1) the

Transferred Customer is located in a building with multiple tenants and at least one of those

tenants is not a Transferred Customer; and (2) the Transferred Customer is the landlord of the

building or otherwise has authority to make decisions related to telecommunications services for

the entire building. For the avoidance of doubt, nothing in this Final Judgment prevents LLA

from initiating customer-specific communications with any AT&T Customer with respect to

those services provided by AT&T to such customer as of the closing date of the Transaction.

T.      If any term of an agreement between LLA and Acquirer to effectuate the

divestiture required by this Final Judgment varies from a term of this Final Judgment, to the

extent that LLA cannot fully comply with both, this Final Judgment determines LLA's

obligations.

## V.      APPOINTMENT OF DIVESTITURE TRUSTEE

A.      If LLA has not divested the Divestiture Assets within the period specified in

Paragraph IV.A, LLA must immediately notify the United States of that fact in writing. Upon

motion of the United States, which Defendants may not oppose, the Court will appoint a

divestiture trustee selected by the United States and approved by the Court to effect the

divestiture of the Divestiture Assets.

B.      After the appointment of a divestiture trustee by the Court, only the divestiture

trustee will have the right to sell the Divestiture Assets. The divestiture trustee will have the

power and authority to accomplish the divestiture to an Acquirer acceptable to the United States,

19

in its sole discretion, at a price and on terms as are then obtainable upon reasonable effort by the divestiture trustee, subject to the provisions of Sections IV, V, and VI of this Final Judgment, and will have other powers as the Court deems appropriate. The divestiture trustee must sell the Divestiture Assets as quickly as possible.

C.     LLA may not object to a sale by the divestiture trustee on any ground other than malfeasance by the divestiture trustee. Objections by LLA must be conveyed in writing to the United States and the divestiture trustee within 10 calendar days after the divestiture trustee has provided the notice of proposed divestiture required under Section VI.

D.     The divestiture trustee will serve at the cost and expense of LLA pursuant to a written agreement, on terms and conditions, including confidentiality requirements and conflict of interest certifications, that are approved by the United States.

E.     The divestiture trustee may hire at the cost and expense of LLA any agents or consultants, including investment bankers, attorneys, and accountants, that are reasonably necessary in the divestiture trustee's judgment to assist with the divestiture trustee's duties. These agents or consultants will be accountable solely to the divestiture trustee and will serve on terms and conditions, including terms and conditions governing confidentiality requirements and conflict-of-interest certifications, that are approved by the United States.

F.     The compensation of the divestiture trustee and agents or consultants hired by the divestiture trustee must be reasonable in light of the value of the Divestiture Assets and based on a fee arrangement that provides the divestiture trustee with incentives based on the price and terms of the divestiture and the speed with which it is accomplished. If the divestiture trustee and LLA are unable to reach agreement on the divestiture trustee's compensation or other terms and conditions of engagement within 14 calendar days of the appointment of the divestiture trustee

20

by the Court, the United States may, in its sole discretion, take appropriate action, including by making a recommendation to the Court. Within three business days of hiring an agent or consultant, the divestiture trustee must provide written notice of the hiring and rate of compensation to LLA and the United States.

G.      The divestiture trustee must account for all monies derived from the sale of the Divestiture Assets sold by the divestiture trustee and all costs and expenses incurred. Within 30 calendar days of the Divestiture Date, the divestiture trustee must submit that accounting to the Court for approval. After approval by the Court of the divestiture trustee's accounting, including fees for unpaid services and those of agents or consultants hired by the divestiture trustee, all remaining money must be paid to LLA and the trust will then be terminated.

H.      LLA must use its best efforts to assist the divestiture trustee to accomplish the required divestiture. Subject to reasonable protection for trade secrets, other confidential research, development, or commercial information, or any applicable privileges, LLA must provide the divestiture trustee and agents or consultants retained by the divestiture trustee with full and complete access to all personnel, books, records, and facilities of the Divestiture Assets. LLA also must provide or develop financial and other information relevant to the Divestiture Assets that the divestiture trustee may reasonably request. LLA must not take any action to interfere with or to impede the divestiture trustee's accomplishment of the divestiture.

I.      The divestiture trustee must maintain complete records of all efforts made to sell the Divestiture Assets, including by filing monthly reports with the United States setting forth the divestiture trustee's efforts to accomplish the divestiture ordered by this Final Judgment. The reports must include the name, address, and telephone number of each person who, during the preceding month, made an offer to acquire, expressed an interest in acquiring, entered into

21

negotiations to acquire, or was contacted or made an inquiry about acquiring any interest in the
Divestiture Assets and must describe in detail each contact with any such person.

      J.      If the divestiture trustee has not accomplished the divestiture ordered by this Final
Judgment within six months of appointment, the divestiture trustee must promptly provide the
United States with a report setting forth: (1) the divestiture trustee's efforts to accomplish the
required divestiture; (2) the reasons, in the divestiture trustee's judgment, why the required
divestiture has not been accomplished; and (3) the divestiture trustee's recommendations for
completing the divestiture. Following receipt of that report, the United States may make
additional recommendations consistent with the purpose of the trust to the Court. The Court
thereafter may enter such orders as it deems appropriate to carry out the purpose of this Final
Judgment, which may include extending the trust and the term of the divestiture trustee's
appointment by a period requested by the United States.

      K.      The divestiture trustee will serve until divestiture of all Divestiture Assets is
completed or for a term otherwise ordered by the Court.

      L.      If the United States determines that the divestiture trustee is not acting diligently
or in a reasonably cost-effective manner, the United States may recommend that the Court
appoint a substitute divestiture trustee.

## VI.   NOTICE OF PROPOSED DIVESTITURE

      A.      Within two business days following execution of a definitive divestiture
agreement, LLA or the divestiture trustee, whichever is then responsible for effecting the
divestiture, must notify the United States of a proposed divestiture required by this Final
Judgment. If the divestiture trustee is responsible for completing the divestiture, the divestiture
trustee also must notify LLA. The notice must set forth the details of the proposed divestiture

and list the name, address, and telephone number of each person not previously identified who offered or expressed an interest in or desire to acquire any ownership interest in the Divestiture Assets.

B.      Within 15 calendar days of receipt by the United States of this notice, the United States may request from Defendants, the proposed Acquirer, other third parties, or the divestiture trustee additional information concerning the proposed divestiture, the proposed Acquirer, and other prospective Acquirers. Defendants and the divestiture trustee must furnish the additional information requested within 15 calendar days of the receipt of the request unless the United States provides written agreement to a different period.

C.      Within 45 calendar days after receipt of the notice required by Paragraph VI.A. or within 20 calendar days after the United States has been provided the additional information requested pursuant to Paragraph VI.B., whichever is later, the United States will provide written notice to LLA and any divestiture trustee that states whether or not the United States, in its sole discretion, objects to Acquirer or any other aspect of the proposed divestiture. Without written notice that the United States does not object, a divestiture may not be consummated. If the United States provides written notice that it does not object, the divestiture may be consummated, subject only to LLA's limited right to object to the sale under Paragraph V.C. of this Final Judgment. Upon objection by LLA pursuant to Paragraph V.C., a divestiture by the divestiture trustee may not be consummated unless approved by the Court.

D.      No information or documents obtained pursuant to this Section VI may be divulged by the United States to any person other than an authorized representative of the executive branch of the United States, except in the course of legal proceedings to which the United States is a party, including grand-jury proceedings, for the purpose of evaluating a

23

proposed Acquirer or securing compliance with this Final Judgment, or as otherwise required by law.

E.       In the event of a request by a third party for disclosure of information under the Freedom of Information Act, 5 U.S.C. § 552, the Antitrust Division will act in accordance with that statute, and the Department of Justice regulations at 28 C.F.R. part 16, including the provision on confidential commercial information, at 28 C.F.R. § 16.7. Persons submitting information to the Antitrust Division should designate the confidential commercial information portions of all applicable documents and information under 28 C.F.R. § 16.7. Designations of confidentiality expire ten years after submission, "unless the submitter requests and provides justification for a longer designation period." *See* 28 C.F.R. § 16.7(b).

F.       If at the time that a person furnishes information or documents to the United States pursuant to this Section VI, that person represents and identifies in writing information or documents for which a claim of protection may be asserted under Rule 26(c)(1)(G) of the Federal Rules of Civil Procedure, and marks each pertinent page of such material, "Subject to claim of protection under Rule 26(c)(1)(G) of the Federal Rules of Civil Procedure," the United States must give that person ten calendar days' notice before divulging the material in any legal proceeding (other than a grand-jury proceeding).

## VII.    FINANCING

Defendants may not finance all or any part of Acquirer's purchase of all or part of the Divestiture Assets or Acquirer's exercise of any options available under Paragraphs IV.J – IV.M of this Final Judgment.

## VIII.   ASSET PRESERVATION OBLIGATIONS

Defendants must take all steps necessary to comply with the Asset Preservation Stipulation and Order entered by the Court. Defendants must take no action that would jeopardize the divestiture ordered by the Court.

## IX.   AFFIDAVITS

A.     Within 20 calendar days of the filing of the Complaint in this matter, and every 30 calendar days thereafter until the Divestiture Date, each Defendant must deliver to the United States an affidavit, signed by that Defendant's Chief Financial Officer and General Counsel, describing the fact and manner of that Defendant's compliance with this Final Judgment. The United States, in its sole discretion, may approve different signatories for the affidavits. Defendant AT&T's obligations under this Paragraph IX.A shall cease 30 calendar days after the closing of the Transaction.

B.     Each affidavit must include: (1) the name, address, and telephone number of each person who, during the preceding 30 calendar days, made an offer to acquire, expressed an interest in acquiring, entered into negotiations to acquire, or was contacted or made an inquiry about acquiring, an interest in the Divestiture Assets and describe in detail each contact with such persons during that period; (2) a description of the efforts Defendants have taken to solicit buyers for and complete the sale of the Divestiture Assets and to provide required information to prospective Acquirers; and (3) a description of any limitations placed by Defendants on information provided to prospective Acquirers. If the information set forth in the affidavit is true and complete, objection by the United States to information provided by Defendants to prospective Acquirers must be made within 14 calendar days of receipt of the affidavit.

C.     Defendants must keep all records of any efforts made to divest the Divestiture Assets until one year after the Divestiture Date.

D.     Within 20 calendar days of the filing of the Complaint in this matter, Defendants also must deliver to the United States an affidavit signed by each Defendant's Chief Financial Officer and General Counsel, that describes in reasonable detail all actions Defendants have taken and all steps Defendants have implemented on an ongoing basis to comply with Section VIII of this Final Judgment. The United States, in its sole discretion, may approve different signatories for the affidavits.

E.     If Defendants make any changes to the efforts and actions outlined in any earlier affidavits provided pursuant to Paragraph IX.D., Defendants must, within 15 calendar days after any change is implemented, deliver to the United States an affidavit describing those changes.

F.     Defendants must keep all records of any efforts made to preserve the Divestiture Assets until one year after the divestiture has been completed.

## X.     APPOINTMENT OF MONITORING TRUSTEE

A.     Upon motion of the United States, which Defendants cannot oppose, the Court will appoint a monitoring trustee selected by the United States and approved by the Court.

B.     The monitoring trustee will have the power and authority to monitor LLA's compliance with the terms of this Final Judgment and the Asset Preservation Stipulation and Order entered by the Court and will have other powers as the Court deems appropriate. The monitoring trustee will have no responsibility or obligation for operation of the Divestiture Assets.

C.     LLA may not object to actions taken by the monitoring trustee in fulfillment of the monitoring trustee's responsibilities under any Order of the Court on any ground other than

26

malfeasance by the monitoring trustee. Objections by LLA must be conveyed in writing to the United States and the monitoring trustee within ten calendar days of the monitoring trustee's action that gives rise to LLA's objection.

D. The monitoring trustee will serve at the cost and expense of LLA pursuant to a written agreement with LLA and on terms and conditions, including terms and conditions governing confidentiality requirements and conflict of interest certifications, that are approved by the United States.

E. The monitoring trustee may hire, at the cost and expense of LLA, any agents and consultants, including investment bankers, attorneys, and accountants, that are reasonably necessary in the monitoring trustee's judgment to assist with the monitoring trustee's duties. These agents or consultants will be solely accountable to the monitoring trustee and will serve on terms and conditions, including terms and conditions governing confidentiality requirements and conflict-of-interest certifications, that are approved by the United States.

F. The compensation of the monitoring trustee and agents or consultants retained by the monitoring trustee must be on reasonable and customary terms commensurate with the individuals' experience and responsibilities. If the monitoring trustee and LLA are unable to reach agreement on the monitoring trustee's compensation or other terms and conditions of engagement within 14 calendar days of the appointment of the monitoring trustee, the United States, in its sole discretion, may take appropriate action, including by making a recommendation to the Court. Within three business days of hiring any agents or consultants, the monitoring trustee must provide written notice of the hiring and the rate of compensation to LLA and the United States.

G. The monitoring trustee must account for all costs and expenses incurred.

H.      LLA must use its best efforts to assist the monitoring trustee to monitor LLA's compliance with their obligations under this Final Judgment and the Asset Preservation Stipulation and Order. Subject to reasonable protection for trade secrets, other confidential research, development, or commercial information, or any applicable privileges, LLA must provide the monitoring trustee and agents or consultants retained by the monitoring trustee with full and complete access to all personnel, books, records, and facilities of the Divestiture Assets. LLA may not take any action to interfere with or to impede accomplishment of the monitoring trustee's responsibilities.

I.      The monitoring trustee must investigate and report on LLA's compliance with this Final Judgment and the Asset Preservation Stipulation and Order. The monitoring trustee must provide periodic reports to the United States setting forth LLA's efforts to comply with their obligations under this Final Judgment and under the Asset Preservation Stipulation and Order. The United States, in its sole discretion, will set the frequency of the monitoring trustee's reports.

J.      The monitoring trustee will serve until the expiration of this Final Judgment, unless the United States in its sole discretion, determines a shorter period is appropriate.

K.      If the United States determines that the monitoring trustee is not acting diligently or in a reasonably cost-effective manner, the United States may recommend that the Court appoint a substitute.

## XI.    FIREWALL

A.      LLA must implement and maintain reasonable procedures to prevent competitively sensitive information from being disclosed, by or through implementation and execution of the obligations in this Final Judgment or any associated agreements, between LLA

28

employees involved in LLA's relationship with Acquirer and any other employee of LLA.  For

example, the employees of LLA tasked with providing transition services must not share any

competitively sensitive information of Acquirer with any other employee of LLA.

      B.     LLA must, within 30 business days of the entry of the Asset Preservation

Stipulation and Order, submit to the United States (and, if one has been appointed, the

monitoring trustee) a document setting forth in detail the procedures implemented to effect

compliance with this Section XI. Upon receipt of the document, the United States will inform

LLA within 30 business days whether, in its sole discretion, it approves of or rejects LLA's

compliance plan. Within ten business days of receiving a notice of rejection, LLA must submit a

revised compliance plan. The United States may request that this Court determine whether

LLA's proposed compliance plan fulfills the requirements of this Section XI.

## XII.    COMPLIANCE INSPECTION

      A.     For the purposes of determining or securing compliance with this Final Judgment

or of related orders such as the Asset Preservation Stipulation and Order or of determining

whether this Final Judgment should be modified or vacated, upon written request of an

authorized representative of the Assistant Attorney General for the Antitrust Division, and

reasonable notice to Defendants, Defendants must permit, from time to time and subject to

legally recognized privileges, authorized representatives, including agents retained by the United

States:

            1.   to have access during Defendants' office hours to inspect and copy, or at the

                 option of the United States, to require Defendants to provide electronic copies

                 of all books, ledgers, accounts, records, data, and documents in the

possession, custody, or control of Defendants relating to any matters

contained in this Final Judgment; and

2. to interview, either informally or on the record, Defendants' officers,

employees, or agents, who may have their individual counsel present,

regarding such matters. The interviews must be subject to the reasonable

convenience of the interviewee and without restraint or interference by

Defendants.

B.      Upon the written request of an authorized representative of the Assistant Attorney

General for the Antitrust Division, Defendants must submit written reports or respond to written

interrogatories, under oath if requested, relating to any of the matters contained in this Final

Judgment.

C.      No information or documents obtained pursuant to this Section XII may be

divulged by the United States to any person other than an authorized representative of the

executive branch of the United States, except in the course of legal proceedings to which the

United States is a party, including grand jury proceedings, for the purpose of securing

compliance with this Final Judgment, or as otherwise required by law.

D.      In the event of a request by a third party for disclosure of information under the

Freedom of Information Act, 5 U.S.C. § 552, the Antitrust Division will act in accordance with

that statute, and the Department of Justice regulations at 28 C.F.R. part 16, including the

provision on confidential commercial information, at 28 C.F.R. § 16.7. Defendants submitting

information to the Antitrust Division should designate the confidential commercial information

portions of all applicable documents and information under 28 C.F.R. § 16.7. Designations of

confidentiality expire ten years after submission, "unless the submitter requests and provides justification for a longer designation period." *See* 28 C.F.R. § 16.7(b).

E.      If at the time that Defendants furnish information or documents to the United States pursuant to this Section XII, Defendants represent and identify in writing information or documents for which a claim of protection may be asserted under Rule 26(c)(1)(G) of the Federal Rules of Civil Procedure, and Defendants mark each pertinent page of such material, "Subject to claim of protection under Rule 26(c)(1)(G) of the Federal Rules of Civil Procedure," the United States must give Defendants ten calendar days' notice before divulging the material in any legal proceeding (other than a grand jury proceeding).

## XIII.    NO REACQUISITION

During the term of this Final Judgment, LLA may not reacquire any part of or any interest in the Divestiture Assets or any AT&T Aerial Fiber Core Segment purchased by Acquirer.

## XIV.    RETENTION OF JURISDICTION

The Court retains jurisdiction to enable any party to this Final Judgment to apply to the Court at any time for further orders and directions as may be necessary or appropriate to carry out or construe this Final Judgment, to modify any of its provisions, to enforce compliance, and to punish violations of its provisions.

## XV.    ENFORCEMENT OF FINAL JUDGMENT

A.      The United States retains and reserves all rights to enforce the provisions of this Final Judgment, including the right to seek an order of contempt from the Court. Defendants agree that in a civil contempt action, a motion to show cause, or a similar action brought by the United States regarding an alleged violation of this Final Judgment, the United States may

establish a violation of this Final Judgment and the appropriateness of a remedy therefor by a
preponderance of the evidence, and Defendants waive any argument that a different standard of
proof should apply.

B.    This Final Judgment should be interpreted to give full effect to the procompetitive
purposes of the antitrust laws and to restore the competition the United States alleged was
harmed by the challenged conduct. Defendants agree that they may be held in contempt of, and
that the Court may enforce, any provision of this Final Judgment that, as interpreted by the Court
in light of these procompetitive principles and applying ordinary tools of interpretation, is stated
specifically and in reasonable detail, whether or not it is clear and unambiguous on its face. In
any such interpretation, the terms of this Final Judgment should not be construed against either
party as the drafter.

C.    In an enforcement proceeding in which the Court finds that Defendants have
violated this Final Judgment, the United States may apply to the Court for a one-time extension
of this Final Judgment, together with other relief that may be appropriate. In connection with a
successful effort by the United States to enforce this Final Judgment against a Defendant,
whether litigated or resolved before litigation, that Defendant agrees to reimburse the United
States for the fees and expenses of its attorneys, as well as all other costs including experts' fees,
incurred in connection with that enforcement effort, including in the investigation of the potential
violation.

D.    For a period of four years following the expiration of this Final Judgment, if the
United States has evidence that a Defendant violated this Final Judgment before it expired, the
United States may file an action against that Defendant in this Court requesting that the Court
order: (1) Defendant to comply with the terms of this Final Judgment for an additional term of at

least four years following the filing of the enforcement action; (2) all appropriate contempt remedies; (3) additional relief needed to ensure the Defendant complies with the terms of this Final Judgment; and (4) fees or expenses as called for by this Section XV.

## XVI.    EXPIRATION OF FINAL JUDGMENT

Unless the Court grants an extension, this Final Judgment will expire ten years from the date of its entry, except that after five years from the date of its entry, this Final Judgment may be terminated upon notice by the United States to the Court and Defendants that the divestiture has been completed and the continuation of this Final Judgment is no longer necessary or in the public interest.

## XVII.    PUBLIC INTEREST DETERMINATION

Entry of this Final Judgment is in the public interest. The parties have complied with the requirements of the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16, including by making available to the public copies of this Final Judgment and the Competitive Impact Statement, public comments thereon, and any response to comments by the United States. Based upon the record before the Court, which includes the Competitive Impact Statement and, if applicable, any comments and response to comments filed with the Court, entry of this Final Judgment is in the public interest.

Date: 2/3/21

[Court approval subject to procedures of Antitrust Procedures and Penalties Act, 15 U.S.C. § 16]

_____
United States District Judge

33